UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. | ) | |
| HEALTH DIMENSIONS | ) | |
| REHABILITATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:12CV00848 AGF |
| | ) | |
| REHABCARE GROUP, INC.; | ) | |
| REHAB SYSTEMS OF MISSOURI; | ) | |
| HEALTH SYSTEMS, INC., and | ) | |
| REHABCARE GROUP EAST, INC.; | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This *qui tam* action is before the Court on (1) the motion filed by the United States

for partial summary judgment on liability and Defendants' affirmative defenses (Doc. No.

306); (2) the (sealed) motion for summary judgment filed by Defendants RehabCare Group

East, Inc., and RehabCare Group, Inc. (jointly "RehabCare") (Doc. No. 310); and (3) the

(sealed) motion for summary judgment filed by Defendants Health Systems, Inc., ("HSI")

and Rehab Systems of Missouri ("RSM") (Doc. No. 313).   Relator brought this action, in

which the Government later intervened, under the False Claims Act, 31 U.S.C. § 3729, et

seq. ("FCA"), alleging that Defendants submitted or caused to be submitted to the United

States false claims for payment under the Medicare and/or Medicaid programs, as the

result of a scheme that violated the Anti-kickback Statute ("AKS").   Oral arguments were

heard on the three motions noted above on Thursday, August 22, 2013.   For the reasons set forth below, the motions shall all be denied.

## BACKGROUND

HSI is a nursing-home management company.   James Lincoln is the majority owner of HSI, a nursing home management company; of the more than 60 HSI-managed nursing facilities in Missouri at issue; and of RSM, a company that provided contract therapy services to residents of the nursing homes.   HSI receives a percentage of the gross revenues of the nursing homes with which it has a management agreement.   Tom Hudspeth is a part owner of RSM.

RehabCare is a provider of therapy to patients at skilled nursing facilities around the country.   In 2003, RehabCare was interested in acquiring "'in-house' therapy companies owned/operated by nursing home owner/operators."   Acquisition of such a company was contingent upon the concurrent entry into long-term therapy contracts with the nursing home chain.   Generally contracts for therapy services are one-year contracts, terminable without cause, but RehabCare wanted longer contracts terminable only with cause.   In July 2003, RehabCare proposed acquiring RSM for $7 million, if RSM's contracts with HSI could be lengthened to five years, terminable only for cause.   An email chain from September 9 and 10, 2003, between RehabCare and RSM indicates that the parties thought the deal as proposed might violate the AKS–that by lengthening the contracts from one year to five and changing the termination provision from termination for any reason to termination for cause, RehabCare could be perceived as purchasing a guaranteed five-year stream of revenue.   RehabCare did not acquire RSM in 2003.

2

In 2004, all of the nursing homes in question entered into new contracts with RSM, changing them from one year to five years, and providing for termination only for cause. At oral argument, Plaintiffs acknowledged that they had no evidence that RehabCare was involved in or advised in 2004 of this change in the form of contracts.   In August 2005, RehabCare, RSM, and HSI restarted negotiations and in February 2006, RSM and RehabCare entered into a five-year "Subcontract Agreement" that called for RehabCare to provide the therapy services at HSI-managed nursing homes and RSM to provide supervision and administrative services.   In exchange, RehabCare agreed to pay RSM a one-time payment of approximately $600,000, as well as a percentage (10% and 15%) of the profit from the therapy services that would be performed by RehabCare.   At the same time, RSM and RehabCare entered into a "Recruitment and Non-Solicitation Agreement," which provided that RSM could not solicit its former therapists for a period of five years.

According to the Government, RehabCare's continuing percentage of profits amounted to approximately $2 million per year since the agreements were entered into. The Government's theory of the case is that the $600,000 payment and the ongoing percentage profit RSM receives constitute illegal kickbacks in violation of the AKS, which prohibits the acceptance or provision of remuneration "in return for referring an individual . . . for . . . any item or service for which payment may be made . . . under a Federal Health Care Program."   42 U.S.C. § 1320a-7b(b)(1)(A).   As posited by the Government, the agreement between RehabCare and RSM resulted in kickbacks paid from RehabCare to RSM in exchange for referrals of business reimbursed by Medicare and Medicaid.   The amended complaint claims that from approximately March 2006 to the time of the

3

Government's intervention in the lawsuit, Defendants thereby knowingly presented, or caused to be presented, to the United States, claims for Medicare and Medicaid payments that falsely certified that the claims were in compliance with the law, in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1) (FCA pre-2009 amendments) and 31 U.S.C. § 3729(a)(1)(A) (current version of FCA).   The Government also asserts state common law claims of unjust enrichment and "payment by mistake."

Defendants contend that the agreements between RehabCare and RSM provide for valid activities–"paying a fee to secure and protect an in-place work force assembled by another or employing a subcontract arrangement that generates a profit for the primary contractor."   In Defendants' view, Lincoln, as the majority owner of RSM and the nursing homes at issue, "structured the transaction with RehabCare in a way that comported with [federal] guidelines and permitted him to centralize and distribute profits as he saw fit." (Doc. No. 122 at 102.)

Relator, a therapy provider that competes with RehabCare, filed its complaint in this action under seal on July 11, 2007.   On August 4, 2011, the Government intervened in relevant part (Doc. No. 47) and the complaint was unsealed.   On December 5, 2011, the United States filed an amended complaint, asserting violation of the False Claims Act (Count I); unjust enrichment (Count II); and payment by mistake (Count III).   (Doc. No. 49.)[1]

---

1   The complaint was filed in the United States District Court for the District of Minnesota and transferred to this Court on May 10, 2012.

## ARGUMENTS OF THE PARTIES

### Government's Motion for Partial Summary Judgment

The Government seeks summary judgment on liability on Count I of the Amended Complaint (violation of the FCA), arguing that the evidence shows that, other than continuing to direct the therapy business to RehabCare, RSM provided no services to RehabCare.   The Government notes that it is undisputed that RMS had no W-2 employees after the 2006 subcontract agreement, and it contends that the evidence shows that RMS provided no services or anything else of value.   The Government also points to certain emails it believes establish that RSM told RehabCare that RSM would not enter into the subcontract agreement absent the up-front payment and continuing percentage payments. The Government also asserts that the undisputed evidence shows that Defendants knew that this transaction was wrongful because Defendants backed away from consummating the 2003 acquisition based on AKS concerns.

The Government further argues that it should be granted summary judgment on Defendants' "affirmative defense" that "damages should be reduced by the reasonable cost of the medically necessary services furnished by the Defendants" to federal healthcare programs.   The Government argues that this is incorrect as a matter of law, and that the proper measure of damages is the full value of each "tainted" claim.[2]

---

2   The Government also challenged other affirmative defenses, such as the statute of limitations and waiver, but these have been withdrawn by Defendants, and that aspect of the Government's motion shall therefore be denied as moot.

5

**Motion for Summary Judgment Filed by RehabCare**

In general, RehabCare contends that it is entitled to summary judgment because the Government has failed to marshal sufficient admissible evidence to prove its FCA claims at trial.   RehabCare argues that the Government's case is based on speculation, and although required to establish a knowing and willful violation of the criminal AKS if its claim is to survive, the Government has no evidence (testimony, documents, or emails) from any representatives or employees of any Defendant indicating that anyone had any intent to violate the AKS when the Subcontract Agreement and the Recruitment and Non-Solicitation Agreement were negotiated and entered in 2006, or thought that the 2006 agreements provided improper kickbacks in order to obtain referrals.

RehabCare argues further that the Government cannot prevail because it cannot prove that Defendants received remuneration for referrals, rather than for something of value, without comparing the fair market value of what RSM was providing and what RehabCare paid RSM, and the Government has presented no such comparison. RehabCare points to the lack of evidence by the Government that, in fact, RSM did not provide the supervision and administrative services the subcontract called for.   In addition RehabCare argues that there is a complete lack of evidence that Defendants knew what they were doing was wrong.   RehabCare argues that the Government's claims for unjust enrichment and payment by mistake fail for the same reasons as its cause of action under the FCA.

**Motion for Summary Judgment filed by HSI and RSM**

Similarly, RSM and HSI argue that the evidence is insufficient to establish that the negotiated rates in the subcontract were not fair market value rates, that no direct evidence exists to prove RSM or HSI knowingly and willfully accepted kickbacks, nor does any indirect or circumstantial evidence support an inference of criminal knowledge and willfulness.   They argue, as do the other Defendants, that the Government cannot meet its burden of establishing illicit remuneration in return for referrals, an essential element of an AKS case, because it has no evidence comparing what RehabCare paid RSM with the fair market value of obtaining an assembled work-force and agreeing not to solicit that work force.   They further argue that the Government has no evidence that RSM did not provide RehabCare with supervisory and administrative services.

**DISCUSSION**

**Summary Judgment Standard**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a). The court must view the record "in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor."   *Chambers v. Pennycook*, 641 F.3d 898, 904 (8th Cir. 2011).   Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

**The FCA and the AKS**

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" by the government, or who conspires to do so.   31 U.S.C. § 3729(a)(1)(A), (C).   FCA states that the terms "knowing" and "knowingly" mean that "(A) a person, with respect to information -- (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud."   31 U.S.C. § 3729(b)(1); *see United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 796 (8th Cir. 2011); *Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1053 (8th Cir. 2002) ("The question on intent here is whether the defendants knew (or would have known absent deliberate blindness or reckless disregard) that their bills would lead the government to believe that they had provided services that they actually did not provide.").

The AKS provides that,

> whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind - (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program or, or, (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony.

42 U.S.C. § 1320a–7b(b)(1)(A)-(B).   The mens rea required for a violation of the AKA only requires proof that the person "knew that his conduct was wrongful, rather than proof

that he knew it violated a known legal duty."   *United States v. Jain*, 93 F.3d 436, 441 (8th Cir. 1996).

Compliance with the AKS is a condition of reimbursement from Medicare programs, and a violation of the AKS is sufficient to state a claim under the False Claims Act.   *United States ex rel. Kosenske v. Carlisle HMA, Inc*., 554 F.3d 88, 94 (3d Cir. 2009); *United States v. Omnicare, Inc.*, No. 07 C 05777, 2013 WL 3819671, at *9 (N.D. Ill. July 23, 2013); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 258, 266 (D.D.C. 2002).   The Court adopts the rule adopted by those courts that have considered the question, that the AKS is violated not only if the "primary motivation of [the] remuneration" was to induce referrals, but merely "if 'one purpose of the payment was to induce future referrals.'"   *United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011) (*quoting United States v. Greber*, 760 F.2d 68, 69 (3d Cir. 1985)); s*ee United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000).

The Court concludes that a rational jury could come out on either side's favor on the material questions of whether Defendants paid remuneration in exchange for referrals, and if so whether this wrongful conduct was willful.   While the evidence that the up-front payment and continuing percentage payments were for referrals, rather than for services and/or other assets from RSM, is not conclusive so as to entitle the Government to summary judgment, neither is it completely lacking so as to entitle Defendants to summary judgment.   The Court believes that the Government's case is thin, because it has not presented evidence of the value (if any) of the services RSM did or did not perform pursuant to the

9

subcontract agreement and/or the value of work force of therapists in place that RSM would not solicit for five years.   However, the Court believes that a jury could find from various emails and testimony that the value of the subcontract agreement and recruitment agreement other than for the referrals was substantially less than what RehabCare agreed to pay RSM, and that at least one purpose (and perhaps even the primary purpose) of the payments was for referrals.

Lack of fair market value, per se, is not an element the Government must provide.   The cases cited by the Government on this point are persuasive.   *See, e.g., United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 29-30 (1st Cir. 1989) ("The trial court did not err in not specifically instructing the jury that the government had to prove that the payments received were not reasonable for the actual work done.   The gravamen of Medicare Fraud is inducement."); *Borrasi*, 639 F.3d at 782 ("Because at least part of the payments to Borrasi was 'intended to induce' him to refer patients to Rock Creek, the status was violated, even if the payments were also intended to compensate for professional services.") (citation omitted).

The evidence surrounding the 2003 negotiations establishes that Defendants were aware of the strictures of the AKS, and that their conduct in 2006 may have been wrongful.   *See United States v. Mousavi*, 604 F.3d 1084, 1092 (9th Cir. 2010) ("[A]wareness of the relevant provisions of the Code or regulations [is] one source of such evidence [of willfulness].") (citation omitted).   Based on this and other circumstantial evidence, the Court believes that summary judgment against the

Government based on the argument that there is a lack of proof of Defendants'
willfulness is not warranted.

With respect to the dispute about the proper measure of damages in this case,
the parties did not address the matter at oral argument on the understanding that the
question would be more appropriately raised later in the litigation of this case by
way of a motion in limine or a motion to strike.   Accordingly, that aspect of the
Government's motion for summary judgment will be denied without prejudice.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the motion for partial summary judgment filed
by the Government is **DENIED** with respect to liability on Count I, and **DENIED as moot**
as it relates to Defendants' affirmative defenses, and **DENIED** without prejudice with
respect to the question of the appropriate measure of damages.   (Doc. No. 306.)

**IT IS FURTHER ORDERED** that the motion for summary judgment filed by
Defendants RehabCare Group East, Inc., and RehabCare Group, Inc., is **DENIED**.   (Doc.
No. 310)

**IT IS FURTHER ORDERED** that the motion for summary judgment filed by
Defendants Health Systems, Inc., and Rehab Systems of Missouri is **DENIED**.   (Doc. No.
313.)

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 30th day of August, 2013.

11